FILED
RICHARD W. NAGEL
CLERK OF COURT

2015 MAY -6 PM 3: 22

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 1:15CR 052 |
| vs. | : | INDICTMENT  J. BARRETT |
| | : | 18 U.S.C. § 1349 |
| DAVID JESS MILLER | : | 18 U.S.C. § 1341 |
| ARTUR STEPANYAN | : | 18 U.S.C. § 371 |
| AKA "ART STEPANYAN" | : | 21 U.S.C. § 333(b)(1) |
| MIHRAN STEPANYAN | : | 21 U.S.C. § 353(e) |
| AKA "MIKE STEPANYAN" | : | 18 U.S.C. § 1001 |
| MINNESOTA INDEPENDENT | : | NOTICE OF FORFEITURE |
| COOPERATIVE, INC. | : | |

The Grand Jury Charges:

At times material to this Indictment:

### INTRODUCTORY ALLEGATIONS

#### Prescription Drug Diversion

1. The wholesale distribution of prescription drugs in the United States was subject to regulation. Regulating the wholesale market was intended to ensure that drugs dispensed to patients were authentic (i.e., not counterfeit), properly labeled, had been handled and maintained according to Food and Drug Administration ("FDA") requirements and industry standards, had been in the possession of state-licensed entities, and had a chain of custody, also known as a pedigree.

2. The FDA was an agency within the U.S. Department of Health and Human Services responsible for protecting the public health by assuring the safety, effectiveness, and security of human and veterinary drugs.

3. Congress enacted the Prescription Drug Marketing Act ("PDMA") in 1988 to combat a practice known as prescription drug diversion. "Diversion" refers to processes by which prescription drugs are removed from, and then reintroduced into the legitimate chain of licensed wholesale distribution. Diverted prescription drugs are reintroduced into the wholesale marketplace through various means, including the falsification of the accompanying pedigrees. Once a prescription drug is diverted outside of the regulated distribution channels, it becomes difficult, if not impossible, for regulators such as the FDA, law enforcement, or end-users to know whether the prescription drug package actually contains the correct drug or the correct dose. Law enforcement officers, regulators, and end users would not know whether the prescription drug was altered, stored in improper conditions, or had its potency adversely affected.

4. Drug diverters use a number of different methods to obtain prescription drugs at discounted prices and reintroduce them at higher prices. In a practice known as street diversion, diverters repurchase dispensed medications from Medicaid or other patients, remove the patient labels, and reintroduce them into the wholesale market. Another common form of diversion, using closed-door pharmacies that are not open to the public, involves the unauthorized resale of drugs that manufacturers sell at steep discounts to hospitals and other healthcare entities. Another form of diversion entails

relabeling expired drugs with counterfeit labels so that they can be reintroduced into the wholesale market. Some drug diversion involves the reintroduction of stolen prescription drugs into the wholesale distribution chain.

5. The aim of prescription drug diversion is to acquire drugs at steep discounts and reintroduce them into the wholesale market in a manner that obscures the fact that the drugs were ever diverted. When done effectively, neither the pharmacist nor the consumer know that the diverted drugs have been handled, packaged, and labeled by parties not authorized or qualified to do so.

6. To prevent drug diversion, the Federal Food, Drug, and Cosmetic Act prohibited any person from engaging in the wholesale distribution in interstate commerce of prescription drugs in a state, unless such person was licensed by that State. Wholesale distribution was defined generally as any distribution of prescription drugs to individuals or entities other than the consumer or patient.

7. In addition, federal law required wholesale distributors, other than manufacturers and authorized distributors of record, to provide a statement, commonly referred to as a pedigree, for each wholesale distribution of a prescription drug. The pedigree was required to list all previous sales of the prescription drug back to the manufacturer or the authorized distributor of record, including the name and address of each party involved in the prior sales. Requiring the affirmative disclosures on the pedigree discouraged the introduction of diverted prescription drugs purchased from

3

illegitimate sources like unlicensed wholesalers, closed-door pharmacies, street diverters, drug counterfeiters, and thieves.

8. Authorized distributors of record was defined as "those distributors with whom a manufacturer has established an ongoing relationship to distribute such manufacturer's products." 21 U.S.C. § 353(e)(3)(A). Pursuant to FDA regulation, "ongoing relationship" meant "an association that exists when a manufacturer and a distributor enter into a written agreement under which the distributor is authorized to distribute the manufacturer's products for a period of time or for a number of shipments. If the distributor is not authorized to distribute a manufacturer's entire product line, the agreement must identify the specific drug products that the distributor is authorized to distribute." 21 C.F.R. § 203.3(u). Drug manufacturers were required to maintain and update lists of authorized distributors of record. Many manufacturers made their list of authorized distributors available to the public online on their websites.

### Individuals and Entities

9. Defendant **DAVID JESS MILLER** ("**MILLER**"), a resident of California, was engaged in the wholesale distribution of prescription drugs. **MILLER** was the majority owner of defendant **MINNESOTA INDEPENDENT COOPERATIVE, INC.** ("**MIC**"). **MILLER** also owned and controlled two California corporations, E-Tail Network, Inc. ("E-Tail") and Biz Support, Inc. ("Biz Support"). At various times during the course of the conspiracy, including from in or about September 2007 through in or about December 2009, **MILLER** used the corporate name E-Tail

4

Network when purchasing diverted prescription drugs from his network of prescription drug suppliers. After approximately December 2009, **MILLER** generally used the corporate name **MIC** when purchasing drugs from his network of drug suppliers. **MILLER** operated MIC and E-Tail from a corporate office in Tustin, California. Biz Support was a retail shipping company in Santa Ana, California controlled by **MILLER**. At various times during the course of the conspiracy, the conspirators used Biz Support to ship prescription drugs from California to/from Puerto Rico, Minnesota, and other states.

10. Defendant **MIC** was a Minnesota corporation with a warehouse facility in Minnesota. **MIC** engaged in the wholesale distribution of prescription drugs to purchasers in approximately 38 states. **MIC** was licensed to engage in the wholesale distribution of prescription drugs in Minnesota and numerous other states. **MIC** was not licensed to engage in the wholesale distribution of prescription drugs in the State of California.

11. The business of **MILLER** and his corporate entities, **MIC** and E-Tail, was to purchase diverted prescription drugs from various illicit drug suppliers located in California, Florida, New York, and other states, and then to resell and ship the diverted prescription drugs to customers, including retail pharmacies and other wholesalers, in various states across the United States, including within the Southern District of Ohio.

12. **MILLER**, through his corporate entities, **MIC** and E-Tail, employed a number of individuals known to the grand jury, including the following:

(a) J.C. handled purchasing prescription drugs from **DAVID MILLER**'s network of drug suppliers. J.C. received offers from the illicit drug suppliers and chose, at the direction of **MILLER**, which drugs E-Tail and **MIC** would purchase. As described in more detail below, at the direction of **DAVID MILLER**, J.C. created fraudulent purchase orders and invoices to hide the fact that **MIC** was purchasing drugs directly from the illicit drug suppliers. At the direction of **DAVID MILLER**, J.C. also created the fraudulent pedigrees associated with **MIC**'s sales of prescription drugs to customers throughout the United States.

(b) B.G. picked up diverted prescription drugs from **MILLER**'s drug suppliers in California, including from defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**. B.G. then shipped the drugs to Puerto Rico or Minnesota, as described below.

(c) M.P. wired payments to **DAVID MILLER**'s drug suppliers from a variety of bank accounts in the names of E-Tail, **MIC**, and B&Y Wholesale, as described below.

(d) J.R. managed the **MIC** warehouse in Minnesota. Along with other warehouse employees, J.R. was responsible for receiving drug shipments, inspecting the drugs for damage and signs of diversion, sorting and organizing the drugs, and using the drugs to fill and ship orders to **MIC**'s customers.

13. Yusef Yassin Gomez ("Yassin") was associated with two Puerto Rico companies. From in or about September 2007 until in or about August 2008, Yassin was

6

employed by Drogueria Caballero del Caribe ("Drogueria Caballero"), a Puerto Rico wholesale drug distributor which was licensed to sell prescription drugs in Puerto Rico. From in or about July 2008 until in or about April 2014, Yassin owned and controlled B&Y Wholesale Distributors ("B&Y"), a Puerto Rico wholesale drug distributor which was licensed to sell prescription drugs in Puerto Rico. Neither of the Puerto Rico companies was an authorized distributor for the manufacturers of any of the prescription drugs involved in the conspiracy charged herein.

14. Defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** sold diverted prescription drugs to **DAVID MILLER** and his company, **MIC**, from in or about July 2009 through at least in or about April 2014. Prior to July 2009, **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** sold diverted prescription drugs to co-conspirator Peter Kats, who sold some of their diverted drugs to **MILLER**. **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** used multiple corporate names in connection with sales of diverted prescription drugs to **MILLER**. These corporate entities included three Nevada corporations, Panda Capital Group, Inc., Red Rock Capital Group, Inc., and Trans Atlantic Capital Group, Inc., and a California corporation, GC National Wholesale, Inc. None of these companies were licensed to engage in the wholesale distribution of prescription drugs in California.

15. Co-conspirator 1 ("CC1") sold, and arranged the sale of, diverted prescription drugs to **MILLER** and his companies, E-Tail and **MIC**, from in or about September 2007 through in or about November 2012. CC1 operated primarily from

7

Miami, Florida. CC1 was not licensed to engage in the wholesale distribution of prescription drugs.

16. Co-conspirator 2 ("CC2") owned and operated a restaurant called Mayumba in Rosemead, California. CC2 was not licensed to engage in the wholesale distribution of prescription drugs. CC2 participated in the conspiracy by acting as a middleman to facilitate the sale of diverted prescription drugs to from CC1 to **MILLER** and his corporate entities, E-tail and **MIC**.

17. Co-conspirator Peter Kats ("Kats") sold diverted prescription drugs to **DAVID MILLER**'s companies, E-Tail, and **MIC** from in or about September 2007 through in or about June 2011. At the direction of **DAVID MILLER**, Kats obtained a wholesale license in Pennsylvania and chose the name Independent Wholesale Drug. Kats operated from California and provided his drugs to **DAVID MILLER** in California. Neither Kats nor his company was licensed to engage in the wholesale distribution of drugs in California.

18. Co-conspirator Joseph Dallal ("Dallal"), doing business as Global Retail Solutions, sold diverted prescription drugs to **DAVID MILLER**'s company, **MIC**, from in or about March 2010 until at least as late as September 2011. Neither Dallal or Global Retail Solutions was licensed to engage in wholesale distribution of drugs in California.

19. Co-conspirator 3 ("CC3"), doing business as Preferred, Inc., sold diverted prescription drugs to **DAVID MILLER** and his company, **MIC**, from in or about March

8

2009 through in or about February 2014. Preferred was licensed to engage in the wholesale distribution of prescription drugs in New York.

20. Co-conspirator 4 ("CC4") was engaged in the wholesale distribution of drugs in California. CC4 was not licensed to engage in the wholesale distribution of drugs. In 2010 and 2011, CC4 sold diverted prescription drugs to Joseph Dallal, who then sold some of CC4's drugs to **MILLER** and **MIC**. Subsequently, from in or about December 2011 until in or about December 2012, working with Dallal and other co-conspirators, CC4 sold diverted prescription drugs to **MILLER** and **MIC**, using the business name Modern Medical Products ("Modern Medical"). The real Modern Medical Products, which is a licensed wholesaler headquartered in Los Angeles, California, did not have any connection to these drug sales to **MILLER** and **MIC**. Instead, CC4 and other co-conspirators simply used the name Modern Medical in selling drugs to **MILLER** and **MIC**.

**COUNT 1**
**CONSPIRACY TO COMMIT MAIL & WIRE FRAUD**
**18 U.S.C. § 1349**

21. The Introductory Allegations of this Indictment, above, are realleged and incorporated by reference as though fully set forth herein.

22. Beginning in or about September 2007 and continuing at least until April 2014, in the Southern District of Ohio and elsewhere, the defendants

**DAVID JESS MILLER**
**ARTUR STEPANYAN**
**MIHRAN STEPANYAN,** and
**MINNESOTA INDEPENDENT COOPERATIVE**

did unlawfully, knowingly, and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the grand jury:

 (a) to knowingly and with intent to defraud devise, and intend to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and to knowingly cause to be delivered certain matter by the United States Postal Service and by a private and commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme, in violation of 18 U.S.C. § 1341; and

 (b) to knowingly and with intent to defraud devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and to transmit and causing to be transmitted certain wire communications in interstate commerce, for the purpose of executing the scheme, in violation of 18U.S.C. § 1343.

### The Object of the Conspiracy

23. It was the object of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by purchasing prescription drugs from unlicensed and illegitimate sources and then reintroducing those drugs into the wholesale and retail market through false statements, representations, and promises, including the use of fraudulent pedigrees that falsely represented the sources and origins of the drugs.

### Manner and Means of the Conspiracy

The manner and means by which the defendants sought to accomplish the object and purpose of the conspiracy included, among other, the following:

24. **MILLER** and his corporate entities, E-Tail and **MIC**, purchased diverted prescription drugs from a group of unlicensed and illicit suppliers, including defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**, CC1, Peter Kats, Joseph Dallal, CC3, and CC4 ("the illicit drug suppliers"). Yusef Yassin Gomez agreed, in exchange for a monthly commission and/or a percentage of total sales, to allow **MILLER**, at various times, to ship drugs to his Puerto Rico companies, Drogueria Caballero and B&Y, and to claim falsely that **MIC** had purchased the drugs from the Puerto Rico companies. Beginning at least as early as January 2010, **MILLER** instructed his employees to create fraudulent invoices and purchase orders falsely stating that the illicit drug suppliers sold the drugs to B&Y, and that B&Y then sold the drugs to **MIC**. **MILLER** instructed his employees to pay the illicit drug suppliers by wire transfer from a series of bank accounts in the name of E-Tail Network, **MIC**, and B&Y Wholesale. **MIC** sold the diverted prescription drugs obtained from the illicit suppliers to wholesale and retail customers throughout the United States, including to customers in the Southern District of Ohio, using fraudulent pedigrees to hide the fact that the drugs were obtained from the illicit drug suppliers.

### A. Purchase of Drugs from Illicit Suppliers

25. **MILLER** and his corporate entities, E-Tail and **MIC**, purchased diverted prescription drugs from the illicit drug suppliers at prices substantially below the Wholesale Acquisition Cost (WAC) prices for prescription drugs that are legitimately obtained from the drug manufacturer, or from licensed wholesale distributors with a genuine pedigree tracing the drugs back to the manufacturer or an authorized distributor of record. Accordingly, **MILLER** generally paid the illicit drug suppliers at least 15 percent and as much as 40 percent or more below WAC prices for the diverted prescription drugs.

26. **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**, using the company names Panda Capital Group, Red Rock Capital Group, Trans Atlantic Capital Group, and GC National Wholesale, sold diverted prescription drugs to **MILLER** and **MIC** from approximately July 2009 until at least April 2014. To make an offer to **MILLER**, **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** faxed or emailed offer sheets to **MIC**'s office in California, listing prescription drugs that were available for sale. **MILLER** and his employees chose which drugs to purchase and faxed the list back to **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**.

27. B.G. then arranged to pick up the drugs from **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** at various locations in the Los Angeles area.

28. CC1 met **MILLER** through CC2, who owned a restaurant in Rosemead, California. From in or about September 2007 through in or about October 2012, CC1

12

and **MILLER** used CC2 as an intermediary in the sales of diverted prescription drugs. To make an offer to **MILLER**, CC1 sent faxed offer sheets to CC2 at his restaurant, which listed the drugs available for sale to **MILLER**. CC2 then faxed that list to **MILLER**'s companies. When **MILLER** and his employees decided which drugs to purchase from CC1's offer, **MILLER**'s employees faxed the list to CC2 at his restaurant, and CC2 then faxed that list back to CC1. CC1 and his associates then caused prescription drugs to be shipped to Puerto Rico, as described below.

29. After approximately October 2012, CC2 no longer served as an intermediary between **MILLER** and CC1. From in or about October 2012 until in or about April 2014, **MILLER** and his employees dealt directly with one of CC1's Miami drug sources.

30. Peter Kats sold diverted prescription drugs to **MILLER** from approximately September 2007 through approximately June 2011. Kats purchased drugs from street sources, cab drivers, pharmacies, and other drug diverters, including **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**. Kats faxed lists of available drugs to **MILLER** and his companies, E-Tail and **MIC**. After **MILLER** and his employees chose which drugs to purchase, B.G. arranged to pick up the drugs from Kats at various locations in the Los Angeles area, including Kats' personal residence and later an office suite. In or about April 2008, Peter Kats sold a large quantity of Proventil asthma inhalers to **MILLER** for approximately $662,000. The Proventil inhalers were later determined to have been stolen from a tractor trailer before Kats purchased them from

13

one of his suppliers. **MILLER** and **MIC** sold a portion of the stolen inhalers to a large wholesaler in Cincinnati, Ohio, for approximately $1 million.

31. Joseph Dallal, doing business as Global Retail Solutions, sold diverted prescription drugs to **MILLER** from in or about February 2010 until at least as late as September 2011. Dallal faxed or emailed a list of available drugs to **MILLER** and his company, **MIC**. After **MILLER** and his employees chose which drugs to purchase, B.G. arranged to pick up the drugs from Dallal at various locations in the Los Angeles area.

33. CC3, doing business as Preferred, Inc., sold diverted prescription drugs to **MILLER** and **MIC** from sometime in 2008 until about February 2014. CC3, operating from his offices in New York and New Jersey, faxed or emailed lists of available drugs to **MILLER** and his companies. After **MILLER** and his employees chose which drugs to purchase, CC3 shipped the drugs to B&Y in Puerto Rico or MIC in Minnesota, as instructed by **MILLER**.

34. CC4 worked with Joseph Dallal and other co-conspirators, using the fake company name Modern Medical to sell diverted prescription drugs to **MILLER** and **MIC** from in or about December 2011 until in or about December 2012. CC4's co-conspirators faxed and emailed lists of available drugs to **MILLER** and **MIC**. After **MILLER** and his employees chose which drugs to purchase, B.G. arranged to pick up the drugs from CC4 and his co-conspirators at various locations in the Los Angeles area.

14

### B. Agreements Between DAVID MILLER and Yusef Yassin Gomez Involving Drogueria Caballero and B&Y Wholesale

35. In or about September 2007, **MILLER** and Yassin agreed to a business arrangement involving shipments of prescription drugs. **MILLER** and his corporate entities, E-Tail and **MIC**, shipped, and directed others to ship, prescription drugs to the warehouse of Yassin's employer, Drogueria Caballero.

36. In exchange for allowing **MILLER** to direct shipments of prescription drugs to the Drogueria Caballero warehouse, **MILLER** agreed to pay Drogueria Caballero a monthly commission.

37. **MILLER** and his company, E-Tail, hired an individual known to the grand jury, whose initials are R.R., to work in the Drogueria Caballero warehouse and handle shipments of prescription drugs. R.R. received shipments of drugs from illicit drug suppliers, including CC1 and Peter Kats. When **MIC** had orders from customers, R.R. used the prescription drugs from CC1, Peter Kats, and other illicit suppliers to fill and ship orders to **MIC**'s customers.

38. In or about July 2008, Yassin created B&Y in Puerto Rico, with an individual known to the grand jury whose initials are R.L.

39. In or about September 2008, Yassin stopped working at Drogueria Caballero. In or about December 2008, Drogueria Caballero and **MILLER** ended their agreement and **MILLER** terminated R.R.'s employment.

40. Beginning at least as early as February 2009, **MILLER** and his employees shipped, and caused others to ship, prescription drugs to the B&Y warehouse, with the

15

agreement of Yassin. Those drugs were then re-shipped to the **MIC** warehouse in Minnesota. In exchange for receiving drugs at the B&Y warehouse and then re-shipping them to the **MIC** warehouse in Minnesota, **MILLER** agreed to pay Yassin a monthly commission.

41. When drugs were received at the B&Y warehouse, B&Y employees created a list of the drugs received, inspected the bottles of drugs for damage and signs of diversion, and then re-shipped the drugs to the **MIC** warehouse in Minnesota.

42. Beginning in or about November 2010, B.G. began shipping the drugs he collected from the California-based suppliers, including **ARTUR STEPANYAN, MIHRAN STEPANYAN**, Peter Kats, and Joseph Dallal, and CC4, directly to the MIC warehouse in Minnesota without first shipping them through the B&Y warehouse.

43. Beginning in or about November 2012, all of the illicit suppliers, including CC1's Miami drug source, directed shipments of drugs to the **MIC** warehouse in Minnesota without first shipping them through the B&Y Wholesale warehouse.

### C. Creation of Fraudulent Invoices and Purchase Orders

44. Beginning at least as early as January 2010 and continuing through at least April 2014, **MILLER** directed **MIC** employees to create fraudulent documents in an effort to make it appear that B&Y, rather than the illicit suppliers, supplied the drugs to **MIC**.

45. At the direction of **MILLER**, when J.C. chose which drugs to purchase from an illicit supplier, J.C. created offer sheets purporting to reflect offers from the illicit