supplier to B&Y, and purchase orders stating that B&Y had purchased the drugs from the illicit drug supplier. J.C. also created invoices in the name of the illicit supplier's company showing a shipment of drugs to B&Y and a payment due from B&Y.

46. After the drugs from the illicit drug suppliers were received at the MIC warehouse in Minnesota, **MIC** employees created additional fraudulent documents. At the direction of **MILLER**, J.R. created purchase orders purporting to show **MIC** purchasing the drugs from B&Y. J.R. emailed the fraudulent purchase orders to B&Y employee A.R. A.R. then used the information from the fraudulent purchase order to create a fraudulent invoice purporting to reflect the sale of the drugs from B&Y to **MIC**.

### D. Wiring Money to the Drug Suppliers

47. **MILLER** and his corporate entities, E-Tail and **MIC**, paid the illicit drug suppliers by wire transfer. Throughout the conspiracy, the illicit drug suppliers provided wiring instructions to **MILLER**'s employees, including M.P., directing payments to a variety of bank accounts.

48. From in or about September 2007 until in or about December 2009, at **MILLER**'s direction, M.P. paid the illicit drug suppliers by wire transfer from E-Tail Network bank accounts in California at City National Bank and Wells Fargo.

49. From in or about January 2010 until in or about March 2011, at **MILLER**'s direction, M.P. paid the illicit drug suppliers by wire transfer directly from a MIC bank account at Wells Fargo.

50. In early 2011, in an effort to make the payments to the illicit drug suppliers appear consistent with the fraudulent pedigrees, the conspirators began paying the illicit suppliers from banks accounts in the name of B&Y. In or about January 2011, Yassin opened a bank account at Wells Fargo in the name of B&Y. Yassin gave **MILLER** and MIC employee M.P. access to the B&Y bank account at Wells Fargo. As instructed by **MILLER**, M.P. transferred money from a MIC bank account into the B&Y Wells Fargo account and then sent wire transfers from the B&Y account to pay the illicit drug suppliers.

51. Beginning in or about July 2011, and continuing through in or about April 2014, **MILLER** instructed M.P. to follow a new procedure to wire payments to suppliers. M.P. wired money from a **MIC** bank account to a B&Y bank account at Doral Bank in Puerto Rico. The money wired into the B&Y account included money to be paid to one or more of the illicit drug suppliers, as well as Yassin's commission payment. After sending the wire transfer, M.P. sent an email to Yassin, attaching wiring instructions M.P. had received from the illicit drug suppliers indicating the bank accounts where the money should be wired. Yassin then initiated, or instructed B&Y employee A.R. to initiate, wire transfers to the illicit drug suppliers as instructed.

52. Throughout the conspiracy, the illicit drugs suppliers directed M.P. to wire money to a wide variety of bank accounts. Defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** directed wire payments to multiple bank accounts in the names of their companies.

18

53. CC1 and his associates directed wire payments to more than 25 different bank accounts in the names of numerous companies and entities. These accounts were located at banks in Cancun, Mexico; Managuas, Nicaragua; Canada; and numerous banks in Florida.

### E. Receipt and Handling of Prescription Drug Shipments in Minnesota

54. Beginning in or about October 2008, shipments of drugs were received at the **MIC** warehouse in Minnesota, either directly from the illicit drug suppliers or re-shipped from B&Y.

55. When shipments of drugs arrived at the **MIC** warehouse in Minnesota, **MIC** employees organized and inspected the drugs. **MIC** warehouse employees cut the shipping labels off of incoming boxes of prescription drugs and shredded the shipping labels. **MIC** warehouse employees inspected the incoming bottles of prescription drugs for damage and signs of diversion, such as scratches in the label, broken seals, and smudged or illegible lot numbers.

56. **MIC** warehouse employees weighed incoming drug bottles to identify bottles that may contain the wrong drug or the wrong dosage.

57. On numerous occasions, **MILLER** and **MIC** discovered various problems and signs of drug diversion with the drugs purchased from the illicit drug suppliers, such as tampered drug bottles, missing inserts, the wrong drug or wrong dosage in the bottle, and scratched or smudged lot numbers. On numerous occasions, **MIC**'s customers returned drugs to **MIC**, stating that the bottles contained the wrong drug, the wrong

dosage, or had other signs of drug diversion. **MILLER** instructed **MIC** employees to destroy the drugs or return them to B.G. **MILLER** and **MIC** then continued to purchase drugs from the illicit supplier despite receiving drugs with problems and signs of drug diversion.

58. **MIC** warehouse employees organized the prescription drugs in the warehouse according to the illicit supplier. Employees created signs identifying the warehouse sections for each illicit drug supplier, including "A" for drugs supplied by **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**; "F" referring to CC2, for drugs supplied by CC1 and his associates; "IW," referencing Independent Wholesale, for drugs supplied by Peter Kats; "J" for drugs supplied by Joseph Dallal; "P," referencing Preferred, Inc., for drugs supplied by CC3, and "MM," referring to Modern Medical, for drugs supplied by CC4.

### F. Sale of Drugs to Customers Using Fraudulent Pedigree Documents

59. Throughout the conspiracy, **MIC** created pedigree documents for its sales of prescription drugs to its customers. **MIC** made its pedigree documents available on its website.

60. The standard **MIC** pedigree included, among other information, the name of the drug, drug dosage, National Drug Code number, manufacturer, lot number and expiration date. The pedigree documents also referenced the pedigree requirements of the Federal Food, Drug, and Cosmetic Act and purported to list prior sales of the drug.

61. From in or about September 2007 through in or about May 2009, the majority of **MIC**'s pedigrees stated that **MIC** had purchased its drugs from Drogueria Caballero and that Drogueria Caballero was an authorized distributor for the drug listed on the pedigree. In truth and in fact, **MIC** and/or E-Tail had purchased the drugs directly from the illicit drug suppliers. The drugs were not purchased from Drogueria Caballero. Further, Drogueria Caballero was not an authorized distributor for any of the drugs sold through the conspiracy.

62. From in or about May 2009 through in or about December 2009, **MILLER** and **MIC** did not use a Puerto Rico company on many of its pedigree documents. At the direction of **MILLER**, many of **MIC**'s pedigrees during this time period stated that **MIC** had purchased its drugs directly from one of four large drug wholesale companies that are authorized distributors for many manufacturers. The large wholesalers reflected on these pedigrees included Amerisource Bergen, Cardinal Health, McKesson, and HD Smith. In truth and in fact, **MIC** had purchased the drugs directly from the illicit drug suppliers. The drugs were not purchased from the large wholesale companies reflected on the pedigree documents.

63. From in or about January 2010 through at least April 2014, nearly all of **MIC**'s pedigrees stated that **MIC** had purchased the drugs from B&Y and that B&Y was an authorized distributor for the drug being sold. In truth and in fact, **MIC** had purchased the drugs directly from the illicit drug suppliers. The drugs were not purchased from

21

B&Y. Further, B&Y Wholesale was not an authorized distributor for any of the drugs sold through the conspiracy.

64. By using the fraudulent pedigrees described above, **MILLER** and **MIC** concealed and did not disclose to their wholesale or retail customers that they were buying diverted drugs from the illicit drug suppliers. **MIC**'s wholesale and pharmacy customers, and ultimately end-users, purchased what they believed were FDA-approved prescription drugs that had remained in regulated, state-licensed distribution channels intended to protect against misbranded, adulterated, sub-potent, improperly handled, counterfeit, and stolen products. Instead, these customers received drugs of unknown quality and origin whose false pedigrees made it practically impossible to determine the true source of the prescription drugs they were receiving.

**All in violation of 18 U.S.C. §§ 1349 and 2.**

### COUNTS 2-11
### MAIL FRAUD
### 18 U.S.C. § 1341

65. The Introductory Allegations of this Indictment, above, are realleged and incorporated by reference as though fully set forth herein.

66. Beginning in or about September 2007 and continuing through at least April 2014, in the Southern District of Ohio and elsewhere, the defendants,

**DAVID JESS MILLER
ARTUR STEPANYAN
MIHRAN STEPANYAN, and
MINNESOTA INDEPENDENT COOPERATIVE**

did knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing such scheme and artifice and attempting to do so, did knowingly cause to be delivered certain mail matter by private and commercial interstate carrier, according to the directions thereon.

### Object of the Scheme to Defraud

67. It was the object of the scheme to defraud for the defendants and their co-conspirators to unlawfully enrich themselves by purchasing prescription drugs from unknown or illegitimate sources and reintroducing those drugs into the wholesale and retail market through false statements, representations, and promises, including the use of fraudulent pedigrees that falsely represented the sources and origins of the drugs.

### The Scheme to Defraud

68. Paragraphs 24 through 64 above (Manner and Means, Count 1) of this Indictment are realleged and incorporated by reference as though fully set forth herein to describe the scheme and artifice to defraud.

### Use of the Mails

69. On or about the dates specified as to each Count below,

**DAVID JESS MILLER**
**ARTUR STEPANYAN**
**MIHRAN STEPANYAN**, and
**MINNESOTA INDEPENDENT COOPERATIVE**

for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly cause to be delivered by the United States Postal Service and by a private and commercial interstate carrier, as specified in each count below, the items as identified in each Count:

| Count | Approx. Date of Mailing | Invoice Number | Description of Items Mailed |
|---|---|---|---|
| 2 | April 21, 2011 | 8464 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to Bettman's Pharmacy in Dayton, Ohio. |
| 3 | August 25, 2011 | 10194 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to Bettman's Pharmacy in Dayton, Ohio. |
| 4 | June 29, 2012 | 13834 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Cincinnati, Ohio. |
| 5 | September 21, 2012 | 15047 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Cincinnati, Ohio. |
| 6 | October 12, 2012 | 15459 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Cincinnati, Ohio. |
| 7 | October 12, 2012 | 15472 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Newark, Ohio. |
| 8 | November 20, 2012 | 16116 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Dayton, Ohio. |

| 9 | February 6, 2013 | 17260 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Middletown, Ohio. |
| 10 | May 28, 2013 | 19515 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Dayton, Ohio. |
| 11 | March 27, 2014 | 26221 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Cincinnati, Ohio. |

**All in violation of 18 U.S.C. §§ 1341 and 2.**

<u>**COUNT 12**</u>
**Conspiracy –
Unlicensed Wholesale Distribution and
False Statements
18 U.S.C. § 371**

70. The Introductory Allegations of this Indictment, above, are realleged and incorporated by reference as though fully set forth herein.

71. Beginning in or about September 2007 and continuing at least until April 2014, in the Southern District of Ohio and elsewhere, the defendants

**DAVID JESS MILLER
ARTUR STEPANYAN
MIHRAN STEPANYAN, and
MINNESOTA INDEPENDENT COOPERATIVE**

did unlawfully, knowingly, and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the grand jury to commit offenses against the United States, to wit:

25

(a) to knowingly engage, and cause others to engage, in the wholesale distribution in interstate commerce of prescription drugs in a state without being licensed in that state, in violation of 21 U.S.C. §§ 331(t), 353(e)(2)(A), and 333(b)(1)(D); and

(b) to knowingly and willfully make and use a false document, knowing such document to contain materially false, fictitious, and fraudulent statements and entries, in a matter within the jurisdiction of the FDA, an agency within the executive branch of the United States, in violation of 18 U.S.C. § 1001.

### The Object of the Conspiracy

72. It was the object of the conspiracy for defendants, **ARTUR STEPANYAN**, **MIHRAN STEPANYAN**, and other illicit drug suppliers to distribute diverted prescription drugs, without a state wholesale license, to **MILLER** and **MIC**. **MILLER** and **MIC** then reintroduced the drugs into interstate commerce using pedigree documents falsely stating they had purchased the drugs from other entities, including large wholesale companies associated with Yusef Yassin Gomez's companies, Drogueria Caballero and B&Y Wholesale, and falsely stating that Drogueria Caballero and B&Y Wholesale were authorized distributors of the drugs being sold.

### Manner and Means

73. Paragraphs 24 through 64 above (Manner and Means, Count 1) of this Indictment are realleged and incorporated by reference as though fully set forth herein as the manner and means of the conspiracy described in this Count.

Overt Acts

74. In furtherance of the conspiracy, and to execute and attempt to execute the conspiracy, the defendants and their co-conspirators committed the following overt acts, among others:

(a) On or about October 15, 2009, and on other numerous occasions, defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** faxed an offer sheet listing prescription drugs they were willing to sell to defendants **DAVID MILLER** and **MIC**;

(b) On or about February 18, 2010, and on other numerous occasions, defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** delivered prescription drugs to B.G., an employee of defendants **DAVID MILLER** and **MIC**, at various locations in Southern California;

(c) On or about the dates in Counts 2 through 11, above, and on other numerous occasions, defendants **DAVID MILLER** and **MIC** shipped prescription drugs, including drugs obtained from **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**, to customers in the Southern District of Ohio;

(d) On or about January 21, 2010, MIC wired approximately $302,801.69 to Red Rock Capital bank account number XXXXXX1781 at Wells Fargo.

(e) On or about May 20, 2010, MIC wired approximately $262,338.74 to Red Rock Capital bank account number XXXXXX1781 at Wells Fargo.

(f) On or about August 19, 2010, MIC wired approximately $475,818.22 to Trans Atlantic Capital bank account number XXXXXX1951 at Nevada State Bank.

(g) On or about February 25, 2011, MIC wired approximately $408,000 to Trans Atlantic Capital bank account number XXXXXX1951 at Nevada State Bank.

(h) On or about April 1, 2011, MIC employee M.P. wired approximately $336,815.89 from a B&Y Wholesale bank account to Trans Atlantic bank account number XXXXXX1951 at Nevada State Bank.

(i) On or about June 28, 2011, MIC employee M.P. wired approximately $426,231.17 from a B&Y Wholesale bank account to Trans Atlantic Capital bank account number XXXXXX9418 at Chase Bank.

(j) On or about December 8, 2011, co-conspirator Yassin wired approximately $1,125,543.35 from a B&Y Wholesale bank account to Trans Atlantic Capital bank account number XXXXXX5875 at CitiBank.

(k) On or about March 15, 2012, co-conspirator Yassin wired approximately $622,925.69 from a B&Y Wholesale bank account to GC National Wholesale bank account number XXXXXX6534 at CitiBank.

(l) On or about July 16, 2013, an employee of B&Y wired approximately $1,394,863.34 from a B&Y Wholesale bank account to GC National Wholesale bank account number XXXXXX6534 at CitiBank.

(m) On or about November 13, 2013, an employee of B&Y wired approximately $1,489,473.73 from a B&Y Wholesale bank account to GC National Wholesale bank account number XXXXXX6534 at CitiBank.

(n) On or about February 7, 2014, an employee of B&Y wired approximately $1,055,979.04 from a B&Y Wholesale bank account to GC National Wholesale bank account number XXXXXX4292 at Bank of America.

**All in violation of 18 U.S.C. §§ 371 and 2.**

## FORFEITURE ALLEGATION

1. The allegations contained in this Indictment are re-alleged and incorporated by reference as if fully set forth in support of this forfeiture.

2. Upon conviction of any offense alleged in Count One (Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, Section 1349), Counts Two through Eleven (Mail Fraud, in violation of Title 18, United States Code, Section 1341), and Count Twelve (Unlicensed Wholesale Distribution, in violation of Title 21, United States Code, Section 333) of this Indictment, **DAVID JESS MILLER, MINNESOTA INDEPENDENT COOPERATIVE, ARTUR STEPANYAN,** and **MIHRAN STEPANYAN,** jointly and severally, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the scheme and artifice to defraud as alleged in the conspiracy to commit the offenses.

29

3. The property to be forfeited as to all counts of this Indictment, includes the following:

    (a.) REAL PROPERTY

        i. Real property known and numbered as 1634 La Loma Drive, Santa Ana, Orange County, California, 92705 with all appurtenances, improvements, and attachments thereon; and

        ii. Real property known and numbered as 1422 Edinger Avenue, Suite 1230, Tustin, Orange County, California 92780 with all appurtenances, improvements, and attachments thereon.

    (b.) MONEY JUDGMENT

        i. A money judgment in the amount of at least $393,806,127.77 in United States currency, representing the amount of proceeds obtained as a result of the conspiracy to commit mail and wire fraud, the mail fraud offenses, and unlicensed wholesale distribution.

4. If any of the property described above, as a result of any act or omission of **DAVID JESS MILLER, MINNESOTA INDEPENDENT COOPERATIVE, ARTUR STEPANYAN,** and **MIHRAN STEPANYAN:**

    (a.) cannot be located upon the exercise of due diligence;

    (b.) has been transferred or sold to, or deposited with, a third party;

    (c.) has been placed beyond the jurisdiction of the Court;

    (d.)    has been substantially diminished in value; or

    (e.)    has been comingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of **DAVID JESS MILLER, MINNESOTA INDEPENDENT COOPERATIVE, ARTUR STEPANYAN, and MIHRAN STEPANYAN,** up to the value of the property listed above as being subject to forfeiture.

                  A True Bill.

                  /S/

                  Grand Jury Foreperson

CARTER M. STEWART
United States Attorney

BRENDA S. SHOEMAKER (0041411)
Financial Crimes Chief