John D. Cline (State Bar No. 237759)
cline@johndclinelaw.com
LAW OFFICE OF JOHN D. CLINE
600 Stewart Street, Suite 400
Seattle, WA  98101
Telephone:  (360) 320-6435

K.C. Maxwell (State Bar No. 214701)
kcm@kcmaxlaw.com
MAXWELL LAW PC
23 Geary Street, Suite 600
San Francisco, CA 94108
Telephone:    (415) 494-8887
Facsimile:     (415) 749-1694

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>ARA KARAPEDYAN et. al.<br><br>　　　　　　　Defendant(s). | Case No.: 3:15-cr-0234-CRB<br>Case No.: 3:16-cr-225-CRB<br><br>**DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29 OR, IN THE ALTERNATIVE, FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33**<br><br>Date:     April 19, 2023<br>Time:    1:30 p.m.<br>Judge:  Hon. Charles R. Breyer<br>Place:   Courtroom 6--17th Floor |

Defendants David Miller and Minnesota Independent Cooperative, Inc. move under Fed. R. Crim. P. 29 and the Fifth Amendment Due Process Clause for judgment of acquittal.  At the close of the government's case, defendants made a Rule 29 motion on the ground that the evidence was insufficient on each element of each count--except for the mailings in Counts 3 through 12, to which defendants stipulated--for a rational juror to find the element proven beyond a reasonable doubt.  T.

1/24/23 at 1514-15.  The Court reserved ruling.  *Id*. at 1516.  Defendants renew that motion here.  Without limiting the breadth of the motion, defendants focus the Court's attention on the agreement element of Count 1--particularly as it relates to the "enterprise," "employed by or associated with," "conduct or participate," and "pattern of racketeering activity" elements of the underlying RICO offense; on the "scheme to defraud" and "intent to defraud" elements of Counts 2 through 12; and on the agreement, knowledge, and "proceeds" elements of Count 13.  Alternatively, defendants move for a new trial under Rule 33.

## ARGUMENT

### I. THE RULE 29 STANDARD.

The sufficiency of the evidence depends on "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Willard*, 230 F.3d 1093, 1095 (9th Cir. 2000).  Circumstantial evidence may support a conviction, but "mere suspicion or speculation . . . does not rise to the level of sufficient evidence."  *United States v. Hernandez-Orellana*, 539 F.3d 994, 1004 (9th Cir. 2008) (quotation omitted); *see, e.g., United States v. Goyal*, 629 F.3d 912, 916 (9th Cir. 2010); *United States v. Andrews*, 75 F.3d 552, 556 (9th Cir. 1996); *United States v. Dinkane*, 17 F.3d 1192, 1196 (9th Cir. 1994).

### II. COUNT 1.

Count 1 charged Miller (but not MIC) with RICO conspiracy under 18 U.S.C. § 1962(d).  According to the Court's instructions, the government was required to prove that Miller agreed to commit the underlying RICO violation.  That offense, in turn--18 U.S.C. § 1962(c)--included as elements the existence of an ongoing enterprise; that the defendant was employed by or associated with the enterprise; that the defendant conducted or participated in the affairs of the enterprise; and that he did so through a pattern of racketeering activity.  T. 1/24/23 at 1528-36.  The evidence was insufficient to establish that Miller had an agreement that encompassed any of these elements.

### A.  Enterprise.

According to the Supreme Court, an associated-in-fact enterprise--the kind charged in Count 1--must have a "structure" with at least three features:  "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).  To constitute an "enterprise," a "group must function as a continuing unit and remain in existence long enough to pursue a course of conduct." *Id*. at 948; *see, e.g., Odom v. Microsoft Corp*, 486 F.3d 541, 552-53 (9th Cir. 2007) (en banc).  The Court's jury instructions set out the following requirements for an enterprise:  a "group of people" with a "common purpose" and an "ongoing organization, either formal or informal."  T. 1/24/23 at 1532-33.

Count 1 alleged that the enterprise at issue was the "Karapedyan-Stepanyan Enterprise."  Doc. 502 at 16, ¶ 30.  The evidence at trial was insufficient for any rational juror to find beyond a reasonable doubt that the Karapedyan-Stepanyan ("K-S") Enterprise existed.  Karapedyan testified that, before his arrest in this case, he had never met or spoken to the Stepanyans.  T. 1/17/23 at 775, 779, 782.  Through Yan German, Karapedyan sold diverted prescription drugs to companies associated with the Stepanyans and laundered the proceeds of those sales, *e.g.*, T. 1/12/23 at 690-91 (Shah); T. 1/17/23 at 765-67, 770-71 (Karapedyan), but that was the extent of their relationship.  They had no "common purpose" other than the usual buyer-seller goal of making money.  Karapedyan and the Stepanyans had no "ongoing organization."

The government's undercover FBI agent, Ravi Shah, described his years-long interaction with Karapedyan.  Although Karapedyan, with Agent Shah's assistance, committed and proposed to commit a series of crimes in addition to sale of diverted drugs, *e.g.*, T. 1/12/23 at 649 (Shah), those other crimes do not reflect any "common purpose" with the Stepanyans.  Nor does Agent Shah's testimony show any "ongoing organization" that would support the existence of the alleged K-S Enterprise.  Agent Shah described various potentially criminal acts--for example, Arman Danelian's establishment of Niva Pharmaceuticals and later sale of the company to Mihran Stepanyan, and his offer to help Karapedyan and Agent Shah set up a similar company, T. 1/12/23 at 668-86 (Shah); *see*

T. 1/17/23 at 776-78 (Karapedyan)--but nothing in his testimony showed that these acts occurred in connection with an "ongoing organization."

The other potentially relevant witnesses did not fill the gaps in the government's proof on the enterprise element.  Artin Sarkissians testified about laundering money for the Stepanyans that they had received from B&Y Wholesale and MIC, *e.g.*, T. 1/17/23 at 794-98, 802-07 (Sarkissians), but he said nothing about Karapedyan or any "ongoing organization."  Rami Houchan's testimony was to similar effect.

Perhaps recognizing that it could not prove the existence of the K-S Enterprise, the government in closing argument sought to redefine the enterprise as Miller, MIC, and MIC's suppliers.  It urged the jury to disregard the reference in the instructions to the "Karapedyan-Stepanyan Enterpise"--the only definition the instructions provided of the charged enterprise.  T. 1/24/23 at 1582 ("Don't let that name distract you or, you know, dissuade you one way or the other.  It doesn't--it's not necessary that a name be attached to it."); *see* T. 1/24/23 at 1681 (similar point in rebuttal).  The government described the enterprise as follows:

> So what is the enterprise?  So here you have Miller.  You have MIC.  You have the suppliers.  And if you think about it, you know, one way to conceptualize it is if you have MIC in the middle, right?  So it doesn't have to be a formal entity, but here we do have.
>
> It's a company.  It's an organized company.  It has people within that company play different roles.  And then on the outside you have the suppliers, right, feeding--feeding that entity and working along with it.

T. 1/24/23 at 1583; *see id*. at 1553.  The government described Miller as "the glue binding the enterprise together."  T. 1/24/23 at 1549; *see* T. 1/24/23 at 1660.  And it presented the jury with a slide depicting Miller and MIC at the center of the alleged enterprise, surrounded by MIC's employees and suppliers.  Exhibit 1 at 68 (slide captioned "Racketeering Conspiracy-Element 2"); *see* T. 1/24/23 at 1589-90 (portion of argument where slide was shown).[1]  Karapedyan was absent from the slide.

The government's effort to redefine the enterprise is understandable, given its inability to prove the K-S Enterprise.  But the indictment controls; the government's attempted redefinition, if

---

[1] Exhibit 1 is the PowerPoint slide deck the government used in its first closing argument.  Exhibit 2 is the slide deck the government used in its rebuttal argument.

adopted by the Court, would amount to a forbidden constructive amendment or prejudicial variance. *See, e.g., United States v. Adamson*, 291 F.3d 606, 614-16 (9th Cir. 2002).  The indictment charged an agreement involving the K-S Enterprise; the government failed to prove that enterprise; and acquittal on Count 1 is therefore required.

### B. Employed By or Associated With.

The second element of the § 1962(c) offense underlying the Count 1 conspiracy was that "the Defendant was employed by or associated with the enterprise."  T. 1/24/23 at 1532.  No rational juror could find beyond a reasonable doubt that Miller was--or agreed to be--employed by or associated with the (nonexistent) K-S Enterprise.  Agent Shah, who spent two years concocting crimes with Karapedyan, never mentioned Miller in his testimony.  Karapedyan had never met or spoken with Miller.  T. 1/17/23 at 781-82 (Karapedyan).  Sarkissians (whom the government included on its slide depicting its version of the enterprise, Exhibit 1 at 68) had no contact with Miller or anyone at B&Y or MIC.  T. 1/17/23 at 819-20 (Sarkissians).  Houchan met Miller once, when Miller referred him to Tran for help in setting up Panda Capital.  T. 1/18/23 at 1038-44 (Houchan).  He did not recall any conversation with Miller, at the meeting or afterward.  T. 1/18/23 at 1041, 1073 (Houchan).  The government certainly proved that Miller was employed by or associated with the uncharged Miller-MIC "enterprise" that it argued to the jury, but it presented no evidence establishing an association with the K-S Enterprise charged in Count 1.

### C. Conduct or Participate.

The third element of the underlying RICO offense is that the defendant "conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity."  T. 1/24/23 at 1532.  The instructions define "conduct or participate" to mean "the Defendant had to be involved in the operation or management of the enterprise."  *Id*.  For the reasons outlined above, there was insufficient evidence from which a rational juror could conclude beyond a reasonable doubt that Miller was "involved in the operation or management" of any K-S Enterprise or that he agreed to be involved.

### D. Pattern of Racketeering Activity.

The jury instructions identified the racketeering acts in Count 1 as mail and wire fraud and money laundering under 18 U.S.C. § 1957. T. 1/24/23 at 1534. The instructions on the § 1957 racketeering acts, in turn, identified the criminal activity from which the laundered funds were derived as mail and wire fraud. T. 1/24/23 at 1535. As discussed below, the evidence is insufficient to establish either mail or wire fraud (or an agreement to commit mail or wire fraud) and thus the evidence is likewise insufficient to establish a violation of, or an agreement to violate, § 1957. Because the government failed to prove the charged racketeering activity (or an agreement to participate in the affairs of the alleged K-S Enterprise through a pattern of such activity), acquittal is required on Count 1.

## III. COUNTS 2 THROUGH 12.

Count 2 charged Miller with conspiracy to commit mail and wire fraud. Counts 3 through 12 charged Miller and MIC with mail fraud. For purposes of these counts, the critical elements are the scheme to defraud and Miller and MIC's alleged intent to defraud.

### A. Scheme to Defraud.

Miller and MIC requested the following jury instruction on the scheme to defraud element: "To establish the existence of a scheme or plan to defraud, the government must prove beyond a reasonable doubt that the scheme or plan, if completed as intended, would cause harm to a property interest of the alleged victim." Doc. 1817 at 17. Over objection, T. 1/23/23 at 1458, the Court instead instructed the jury that "[t]o establish the existence of a scheme or plan to defraud, the Government must prove beyond a reasonable doubt that the object of the scheme was to obtain money or property from the alleged victims," T. 1/24/23 at 1540, thus omitting the requirement of intended harm to the alleged victim's property interests. For the reasons discussed at trial, we contend that the Court's instruction was error.

If the scheme to defraud must have as its object harm to a victim's property interests, as Miller and MIC maintain, then the evidence is insufficient on that element. There was no evidence that MIC sought to sell fake, defective, or poor-quality prescription drugs. To the contrary, James Russo and Bernie Guillen described MIC's extensive quality control program, under which each bottle was

carefully inspected and weighed and defective bottles were destroyed or returned to the supplier. T. 1/11/23 at 517-23 (Russo); Exhibit 609 at 86-92 (Guillen deposition).

The MIC customers who testified at trial acknowledged that MIC sold prescription drugs to them at a significant discount and that they, in turn, sold the drugs for more than they had paid. *E.g.*, T. 1/10/23 at 227-29 (O'Leary); T. 1/10/23 at 302-07 (Kornechuk); T. 1/11/23 at 515-16 (Russo); T. 1/17/23 at 835-36 (Chan); T. 1/23/23 at 1331, 1344, 1346-47 (Rumpler); T. 1/24/23 at 1506-08 (Gauk). When customers returned products, MIC gave refunds or credits. T. 1/10/23 at 228-29 (O'Leary); T. 1/11/23 at 526-27 (Russo). And MIC's customers kept their profits from doing business with MIC even after Miller and MIC were indicted. Stephanie Kornechuk and Judith Rumpler acknowledged that they did not offer a refund to customers who purchased MIC-supplied drugs, T. 1/10/23 at 306-07 (Kornechuk); T. 1/23/23 at 1347 (Rumpler), and no one gave contrary testimony. Not a single customer claimed at trial to have lost money, or suffered any other harm to a property interest, from doing business with MIC. There is no evidence that MIC's sale of prescription drugs had as its object harm to its customers' property interests.

**B.      Intent to Defraud.**

The Court instructed the jury that the intent to defraud element of the mail and wire fraud statutes requires an intent to deceive and cheat. T. 1/24/23 at 1537, 1538. Miller and MIC requested a further instruction that "[t]o prove an intent to cheat, the government must establish that the defendant intended to cause loss or other harm to the alleged victim's money or property." Doc. 1817 at 21. Over objection, T. 1/23/23 at 1458-59, the Court declined to give defendants' requested instruction.

For the reasons discussed at trial, we contend that the Court's refusal to define the intent to cheat as Miller and MIC requested was error. If our view of the law is correct, then the evidence on the intent to defraud element of Counts 2 through 12 was insufficient for a rational juror to find it proven beyond a reasonable doubt. The government presented no evidence that Miller or MIC intended to cause MIC's customers to lose money or suffer any other property harm. And as discussed in the preceding section, Miller and MIC went to great lengths to ensure that the prescription drugs

MIC sold were high-quality; MIC's customers paid lower prices for the drugs than they could obtain from other wholesalers; and they sold the drugs at a profit.

Under what we maintain is the correct understanding of the wire and mail fraud statutes, Miller should receive a judgment of acquittal on Counts 2 through 12, and MIC should be acquitted on Counts 3 through 12.

## IV.    COUNT 13.

Count 13 charged Miller with conspiracy to launder money in violation of 18 U.S.C. § 1956. The government failed to prove the agreement element of the offense. It also failed to prove that Miller knew the transactions at issue were "designed in part or in whole to conceal or disguise the nature o[r] the control of the proceeds." T. 1/24/23 at 1542. And it failed to prove that the funds at issue "involv[ed] property that represented the proceeds of the mail and wire fraud." *Id*.

Count 13 purported to charge a single overall money laundering conspiracy. Doc. 502 at 25-27. In closing, however, the government alleged four separate money laundering agreements: Miller's alleged agreement with Galan to launder money paid to Ricardo Jurado for prescription drugs by wiring money into overseas accounts; Miller's alleged agreement with the Stepanyans to launder money paid to them for prescription drugs by wiring payments into various corporate accounts; the use of B&Y to pay suppliers; and the use of money B&Y and MIC had wired to WJ Capital to pay for the beach house renovations. *E.g.*, T. 1/24/23 at 1590-92, 1670-73. The evidence is insufficient to support a money laundering conspiracy conviction based on any of those alleged agreements.

### A.    Agreement.

Most fundamentally, the government failed to prove the agreement element of the Count 13 offense. For example, Galan testified that he passed on Jurado's request that payment for prescription drugs he had supplied be wired into overseas accounts, and MIC in most instances complied--but he did not testify that Jurado's use of foreign bank accounts was part of a money laundering agreement with Miller. T. 1/11/23 at 598-99 (Galan). Galan testified that Jurado did not explain to him his reason for using various accounts to receive payment. T. 1/11/23 at 599-602 (Galan). From Galan's perspective, the overseas accounts were "just a way of getting paid." T. 1/11/23 at 600 (Galan). For

all the record shows, Jurado was one of a number of MIC's suppliers, and--as with other suppliers--MIC wired payment for the prescription drugs into the accounts he specified.

The government's proof of the alleged Stepanyan agreement suffers from the same defect. At the Stepanyans' request, B&Y and MIC wired payment for prescription drugs they supplied into various corporate accounts--Panda, Red Rock, GNC, and so on. But there was no evidence those commercial transactions were part of a money laundering agreement. To be sure, after receiving the wires from B&Y and MIC, the Stepanyans engaged in blatant money laundering through Sarkissians and Houchan. But there is no evidence Miller even knew about those activities, much less that he reached an agreement with the Stepanyans about them. As noted above, Sarkissians testified that he had no contact with Miller or anyone at B&Y or MIC. T. 1/17/23 at 819-20 (Sarkissians). Houchan did not recall any conversation with Miller, at the meeting where Miller introduced him to Tran or afterward. T. 1/18/23 at 1041, 1073 (Houchan).

The alleged B&Y agreement is similarly unsupported. The evidence showed that MIC paid suppliers through B&Y. That evidence might tend to establish that Miller and MIC sought to portray B&Y as the supplier of the prescription drugs that MIC sold to its customers--what the government characterized in its rebuttal as "drug laundering." T. 1/24/23 at 1659. But it does not show that the B&Y payments were part of a *money* laundering agreement. Yassin--the government's key witness on B&Y matters--provided no such testimony, nor did anyone else.

Finally, the government failed to prove the alleged beach house agreement. The only potential co-conspirator the government identified was Brad Ludes. But the government did not dare ask Ludes directly whether he agreed with Miller to launder money, and on cross he forcefully denied doing so. T.1/23/23 at 1381 (Ludes). The government did not challenge this testimony on redirect. There is no evidence, direct or circumstantial, from which a rational juror could find beyond a reasonable doubt that Miller and Ludes agreed to launder money.[2]

---

[2] In its first closing argument, the government did not identify Ludes or anyone else as Miller's co-conspirator for the alleged beach house agreement. T. 1/24/23 at 1592. The government's rebuttal slide on Count 13 purported to list the money laundering co-conspirators. The slide does not mention Ludes or anyone else who could conceivably be a party to the alleged beach house agreement. Exhibit 2 at 14 (slide captioned "Count 13: Money Laundering Conspiracy"). The government did not

**B.     Knowledge of Design to Conceal or Disguise.**

The government did not present evidence from which a rational juror could find beyond a reasonable doubt that Miller knew any of the transactions at issue were "designed in part or in whole to conceal or disguise the nature o[r] the control of the proceeds." T. 1/24/23 at 1542. The evidence is to the contrary.

First, with one exception--Miller's initial purchase of prescription drugs from David Konigsberg, where Miller paid cash at Konigsberg's request, T. 1/18/23 at 972--MIC (or in some instances E-Tail) paid suppliers by wire transfer. *E.g.*, T. 1/10/23 at 335 (Kats); T. 1/11/23 at 385-86 (Kats); T. 1/11/23 at 598-99 (Galan); T. 1/18/23 at 975-76, 989-90 (Konigsberg); T. 1/18/23 at 1070-71 (Houchan). When MIC transferred money to B&Y to pay suppliers or other expenses, it did so by wire, and B&Y similarly made the payments by wire. *E.g.*, T. 1/17/23 at 805-06 (Sarkissians); T. 1/23/23 at 1254-69, 1292-96 (Yassin). Miller's name and signature appeared on the account documents for the B&Y account at Wells Fargo, T. 1/23/23 at 1237-41 (Yassin)--hardly the conduct of a person seeking to hide the nature or source of the funds B&Y wired.

The MIC and B&Y transfers to WJ Capital of the money for the beach house renovations were likewise by wire. T. 1/23/23 at 1296-1300 (Yassin); T. 1/23/23 at 1354-55, 1362-63, 1370-72 (Ludes). When WJ Capital made payments either for the beach house or directly to Miller, it did so by wire or check. *E.g.*, T. 1/23/23 at 1360-63, 1364-65, 1367-70, 1374-76 (Ludes); T. 1/23/23 at 1390 (Laughton). Similarly, MIC's direct payments for the beach house renovations were by wire. T. 1/23/23 at 1391-92 (Laughton). As Agent Tovey's testimony shows, all of those transfers were readily traced using bank records. *E.g.*, T. 1/23/23 at 1434 (Tovey). Miller's insistence on wire transfers traceable back to MIC or E-Tail, companies he openly owned, contrasts sharply with, for example, Sarkissians' and Houchan's withdrawal of large amounts of cash for the Stepanyans. *E.g.*, T. 1/17/23 at 791-93, 800-03, 817-19 (Sarkissians); T. 1/18/23 at 1060-66 (Houchan).

---

mention Ludes, or the alleged beach house agreement, in its rebuttal argument. T. 1/24/23 at 1670-73.

Second, there was no testimony or other evidence that Miller knew, intended, or agreed that any of the transfers B&Y or MIC made, or that he directed out of his WJ Capital account, had as their purpose concealing the nature or the source of the transaction. None of the five key witnesses on this point--Galan, Sarkissians, Houchan, Yassin, and Ludes--testified, or presented evidence from which a juror could infer, that Miller had such knowledge.

### C. Proceeds.

The government failed to prove that the alleged money laundering agreement involved "proceeds" of mail and wire fraud. For the reasons discussed above, the government did not present sufficient evidence that Miller committed (or agreed to commit) mail and wire fraud, and thus it failed to prove that the transactions at issue in Count 13 involved proceeds of those offenses.

## V.   ALTERNATIVE MOTION FOR NEW TRIAL.

If the Court declines to grant judgment of acquittal, it should order a new trial under Fed. R. Crim. P. 33. "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992) (quotation omitted). The Court's "power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *Id*. "The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000).

For the reasons outlined in the preceding sections, the Court should grant judgment of acquittal. If the Court grants judgment of acquittal, it should conditionally determine that a new trial should be ordered if the judgment of acquittal is later vacated or reversed. Fed. R. Crim. P. 29(d)(1). If the Court declines to grant judgment of acquittal, it should exercise its discretion to order a new trial.

# CONCLUSION

For the foregoing reasons, the Court should enter a judgment of acquittal for Miller and MIC. If the Court declines to enter judgment of acquittal, it should order a new trial.

Dated: March 1, 2023

Respectfully submitted,

LAW OFFICE OF JOHN D. CLINE

By: /s/
John D. Cline

Attorney for Defendant
DAVID MILLER

MAXWELL LAW PC

By: /s/
K.C. Maxwell

Attorney for Defendant
MINNESOTA INDEPENDENT
COOPERATIVE, INC.

# CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of March, 2023, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will serve all other parties.

/s/  John D. Cline
John D. Cline

Attorney for Defendant David Miller